# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: March 5, 2026
Refiled: March 25, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

| | | |
|---|---|---|
| SHIRLEY SCOTT, | \* | |
| | \* | |
| Petitioner, | \* | No. 20-1982V |
| | \* | |
| v. | \* | Special Master Young |
| | \* | |
| SECRETARY OF HEALTH | \* | |
| AND HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

*Jimmy A. Zgheib*, Zgheib Sayad, P.C., White Plains, NY, for Petitioner.
*Irene Angelica Firippis*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On December 28, 2020, Shirley Scott ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Program" or "Program"). 42 U.S.C. § 300aa-10 to 34 (2018). Petitioner alleged that she suffered from "a right [s]houlder [i]njury [r]elated to [v]accine [a]dministration ("SIRVA"), . . . resulting from adverse effects of an influenza [("flu")] vaccine [she] received on October 30, 2019." Pet. at 1, ECF No. 1. I resolved Petitioner's claim on the record and issued a Ruling on Entitlement on September 25, 2024. ECF No. 42. The case proceeded to damages, but the parties were unable to make progress on an amount for pain and suffering or out-of-pocket expenses.[2] For the reasons discussed below, and after considering the entire record and argument from the parties, **I find that Petitioner is entitled to $2,323.33 in out-of-pocket expenses and a total pain and suffering award of $195,000.00**.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Following a status conference held on October 17, 2024, I ordered Respondent to only brief the issue of pain and suffering because he expressed a disinterest in considering evidence related to out-of-pocket expenses. *See* ECF No. 46. Despite this Order, Respondent's brief regarding damages included a section addressing out-of-pocket expenses which directly acknowledged that I had ordered him not to do so. Resp't's Br. at 11, ECF No. 47. Accordingly, I will not consider Respondent's arguments on this matter and only address those related to pain and suffering.

## I.    Relevant Procedural History

Due to Petitioner's SIRVA allegation, Petitioner's case was originally assigned to the Chief Special Master and the special processing unit ("SPU"). ECF No. 4. Petitioner filed a motion for a ruling on the record and a brief in support of damages on May 17, 2022. Pet'r's Br., ECF No. 26. Respondent filed his Rule 4(c) Report arguing against compensation on July 7, 2022. Resp't's Report, ECF No. 27. Petitioner filed a reply on July 13, 2022. ECF No. 28. This case was reassigned to me on July 15, 2022. ECF No. 30. I stayed Petitioner's motion for a ruling on the record until after the filing of expert reports. ECF No. 31.

Petitioner filed her first expert report from Marko Bodor, M.D., along with supporting medical literature, on September 23, 2022. Pet'r's Ex. 19, Tabs 1–5, Pet'r's Ex. 20, ECF No. 32. Respondent filed his first expert report from Geoffrey D. Abrams, M.D., along with supporting medical literature on January 19, 2023. Resp't's Ex. A, Tabs 1–10, Resp't's Ex. B, ECF No. 35. Petitioner filed a supplemental report from Dr. Bodor on February 22, 2023. Pet'r's Ex. 21, ECF No. 36. On March 30, 2023, I held a status conference to discuss whether additional argument was needed to resolve Petitioner's Table claim. Min. Entry, docketed Mar. 30, 2023. Following the status conference, on April 13, 2023, Respondent submitted a status report indicating that he did not believe further argument was warranted. ECF No. 38.

I resolved Petitioner's claim on the record and issued a Ruling on Entitlement on September 25, 2024. ECF No 42. The case has been in the damages phase since then. ECF No. 43. On October 17, 2024, I held a status conference to discuss the issue of damages. Min. Entry, docketed Oct. 17, 2024. I noted that Respondent had refused to identify areas of common ground or to engage in any attempts to settle damages. ECF No. 46. I also noted that Respondent had expressed a disinterest in considering any evidence related to Petitioner's out-of-pocket expenses. *Id.* Accordingly, I ordered Respondent to submit briefing on pain and suffering only by no later than November 8, 2024. *Id.* Respondent filed his brief addressing both pain and suffering and out-of-pocket expenses on November 8, 2024. Resp't's Br., ECF No. 47. Petitioner filed a reply and an affidavit from Petitioner on January 8, 2025. Pet'r's Ex. 23, ECF No. 49; Pet'r's Reply, ECF No. 50. This matter is now ripe for adjudication on the issue of damages.

## II.    Medical History

### A.  Vaccination

On October 30, 2019, Petitioner received an intramuscular flu vaccination in her right arm at Walmart Pharmacy in Flowood, Mississippi. Pet'r's Ex. 2 at 3–4.

### B.  Post -Vaccination Medical History

On November 20, 2019, 21 days after vaccination, Petitioner saw her primary care physician ("PCP"), Dr. Tobe Momah, for an annual physical. Pet'r's Ex. 4 at 117–18. Petitioner reported "neck pain and spasm" after her flu vaccination, which limited her movement during

exercise. *Id.* Dr. Momah prescribed diclofenac sodium 1% gel[3] for topical treatment of Petitioner's neck muscle spasm. *Id.* at 120.

On December 10, 2019, 41 days after vaccination, Petitioner returned to her PCP and saw Dr. Ardarian Pierre with complaints of "right arm pain since receiving flu shot." Pet'r's Ex. 4 at 124. Petitioner reported that the symptoms began "[four-to-five] weeks ago" and she found "some relief" with ice. *Id.* A physical examination showed a normal range of motion of Petitioner's right shoulder. *Id.* Dr. Pierre prescribed 750mg of Robaxin and 800mg of Ibuprofen and advised Petitioner to avoid exercise and weightlifting with her right arm until the symptoms resolved. *Id.* at 125.

On December 19, 2019, Petitioner returned to Dr. Momah with complaints of new onset "sharp pain in the right shoulder" after her flu vaccination. Pet'r's Ex. 4 at 129. Petitioner reported "decreased mobility, sharp pain and increased tenderness in the right shoulder." *Id.* Petitioner graded her pain as "10/10, worsening and sharp." *Id.* Petitioner noted that "she was in normal health" until the flu vaccination. *Id.* Petitioner further reported that the over-the-counter medications, prescriptions, and ice did not resolve her pain. *Id.* A physical examination showed decreased range of motion in Petitioner's right shoulder and neck pain and stiffness. *Id.* at 130. Dr. Momah diagnosed Petitioner with neuropathic pain of the right shoulder, acromioclavicular joint osteoarthritis, shoulder impingement, and cervical radiculopathy. *Id.* at 131–32. Dr. Momah prescribed Petitioner 75mg of Lyrica[4] and 50mg of Ultram[5] and ordered x-rays of the right shoulder and cervical spine. *Id.* at 133–34. Petitioner was also referred to physical therapy. *Id.* The cervical spine x-ray revealed "chronic degenerative disc changes [] most pronounced at C4-4, C5-6." *Id.* at 139. The right shoulder x-ray revealed "mild osteoarthritis" of the acromioclavicular[6] and glenohumeral joints.[7] *Id.* at 142.

On December 27, 2019, Petitioner began physical therapy at the University of Mississippi Medical Center ("UMMC") for right shoulder pain with Stacey Lee, DPT. Pet'r's Ex. 4 at 145. During her initial evaluation, Petitioner reported pain since her flu shot had worsened since onset. *Id.* Petitioner also noted that she "never had neck or shoulder issues prior to this onset." *Id.*

---

[3] Diclofenac sodium 1% gel "is used to treat pain and other symptoms of arthritis of the joints . . . such as inflammation, swelling, stiffness, and joint pain." *Mayo Clinic* (July 26, 2024, 2:01pm), https://www.mayoclinic.org/drugs-supplements/diclofenac-topical-application-route/side-effects/drg-20063434?p=1.

[4] Lyrica is a "trademark for a preparation of pregabalin." *Lyrica*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=29107 (hereinafter, "DORLAND'S"). Pregabalin is "a derivative of γ-aminobutyric acid (GABA) having anticonvulsant and antinociceptive effects, used in the treatment of neuropathic pain in diabetic neuropathy and postherpetic neuralgia; administered orally." *Pregabalin*, DORLAND'S.

[5] Ultram is a "trademark for a preparation of tramadol hydrochloride." *Ultram*, DORLAND'S. Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery; administered orally." *Tramadol Hydrochloride*, DORLAND'S.

[6] The acromioclavicular joint is "the synovial joint between the acromion of the scapula and the acromial extremity of the clavicle." *Articulatio Acromioclavicularis*, DORLAND'S.

[7] The glenohumeral joint is "the joint formed by the head of the humerus and the glenoid fossa of the scapula." *Glenohumeral Joint*, DORLAND'S.

Petitioner rated her current pain at 6.5/10. *Id.* A physical examination revealed range of motion restrictions with flexion at 85 degrees, abduction at 58 degrees, and external rotation at 20 degrees with mild to moderate strength deficits. *Id.* at 147–48. By January 3, 2020, Petitioner had completed three sessions of physical therapy. *Id.* at 161. At this session, Petitioner indicated that she desired to stop physical therapy until her orthopedic follow-up to discuss her magnetic resonance imaging ("MRI") results. *Id.* at 162. Petitioner's reported pain was 2/10, and she was advised to continue with pain-free activities. *Id.*

On January 2, 2020, Petitioner underwent an MRI. Pet'r's Ex. 4 at 160. The impression was "[h]igh-grade near full-thickness articular surface tear involving the majority of the supraspinatus tendon with tendinosis[8][,] [t]ear of the superior labrum [(SLAP)] [, and] [m]oderate AC joint osteoarthritis." *Id.*

On January 22, 2020, Petitioner returned to UMMC to see orthopedic surgeon Dr. William Geissler reporting right shoulder pain since her flu shot. Pet'r's Ex. 4 at 172. Petitioner noted that the pain was constant and "radiate[d] down to her elbow." *Id.* Petitioner also reported that the pain prevented her from sleeping. *Id.* Because of the pain, Petitioner could not "raise her arm in front of her and [could not] raise it behind" and "[felt] weak with overhead activities and some numbness." *Id.* A physical examination revealed flexion at 45 degrees, abduction of 45 degrees, and external rotation of 60 degrees *Id.* Dr. Geissler's impression was right torn rotator cuff[9] and SLAP lesion. *Id.* Petitioner noted that physical therapy did not provide relief and requested surgery. *Id.*

Petitioner underwent arthroscopic debridement of the labrum and biceps tendon release of the right shoulder by Dr. Geissler on February 18, 2020. Pet'r's Ex. 4 at 800. Petitioner saw Dr. Geissler for a two-week post-operative visit on March 9, 2020. *Id.* at 220. A shoulder x-ray revealed a rotator cuff repair and subacromial decompression without complication. *Id.* at 217. Petitioner began post-operative physical therapy at UMMC on March 23, 2020. *Id.* at 223. Petitioner attended 55 sessions, through September 9, 2020. *Id.* at 561.

On July 13, 2020, Petitioner saw Dr. Geissler for a five-month post-operative visit. Pet'r's Ex. 4 at 360. Petitioner complained of a "frozen shoulder" with "pain about the shoulder that radiate[d] up about the base of the neck area, supraclavicular area" and "decreased motion." *Id.* A physical examination revealed range of motion restrictions with a flexion of 90 degrees and abduction of 90 degrees with mild strength deficits. *Id.* Dr. Geissler diagnosed Petitioner with adhesive capsulitis[10] and administered a Depo-Medrol injection in her right shoulder. *Id.* Dr. Geissler further advised Petitioner to continue physical therapy. *Id.* Petitioner returned for a seven-

---

[8] Tendinosis or tendinitis is the "inflammation of tendons and of tendon-muscle attachments." *Tendinitis*, DORLAND'S.

[9] The rotator cuff is "a musculotendinous structure about the capsule of the shoulder joint, formed by the inserting fibers of the supraspinatus, infraspinatus, teres minor, and subscapularis muscles, blending with the capsule and providing mobility and strength to the shoulder joint." *Rotator Cuff*, DORLAND'S.

[10] Adhesive capsulitis is "adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa, characterized by shoulder pain of gradual onset, with increasing pain, stiffness, and limitation of motion." *Adhesive Capsulitis*, DORLAND'S.

month post-operative follow-up appointment on September 14, 2020. *Id.* at 576. Dr. Geissler found Petitioner made "absolutely no improvement" since her last visit and advised to proceed with a procedure. *Id.* at 577.

On September 22, 2020, Petitioner underwent an arthroscopic manipulation and debridement of adhesions and right shoulder decompression by Dr. Geissler. Pet'r's Ex. 4 at 801–02. During the procedure, Dr. Geissler noted that Petitioner's "shoulder was quite stiff. We could not manipulate it." *Id.* at 667. The procedure included "a total capsule release from the 3 o'clock position to the 9 o'clock position." *Id.* Petitioner began physical therapy at Elite Physical Therapy for post-operative rehabilitation on September 28, 2020. Pet'r's Ex. 5 at 131.

Petitioner returned to Dr. Geissler for a post-operative visit on September 30, 2020. Pet'r's Ex. 4 at 667. Petitioner was encouraged to use her shoulder as much as possible and to continue with physical therapy. *Id.* at 667–68.

On November 18, 2020, Petitioner saw Dr. Momah for concerns of high blood pressure and weight gain. Pet'r's Ex. 4 at 741. Petitioner noted that she was "unable to fully flex her right upper extremity." *Id.* Petitioner was encouraged to use Voltaren gel, to go to physical therapy, and to follow up with her orthopedic surgeon. *Id.*

Petitioner returned to Dr. Geissler for a post-operative visit on December 2, 2020. Pet'r's Ex. 4 at 767. Dr. Geissler noted that Petitioner "still need[ed] some additional therapy in motion, but she ha[d] improved significantly to what she was preoperatively." *Id.* Petitioner reported that she was "quite pleased and want[ed] to continue therapy" and no longer required pain medication. *Id.* A physical examination revealed active flexion of 120, abduction of 120, external rotation of 60, and strength 4/5. *Id.*

On February 2, 2021, Petitioner had her last visit for post-operative physical therapy. Pet'r's Ex. 8 at 7. Petitioner had a total of 49 visits. *Id.* Petitioner rated her pain at 2/10, met three of her goals, and partially met the remaining three goals. *Id.* at 7–8. Petitioner's progress plateaued and she was advised to continue exercises at home. *Id.*

Petitioner returned to Dr. Geissler for a post-operative visit on February 3, 2021. Pet'r's Ex. 9 at 14. Petitioner reported improvement with her physical therapy but requested additional pain medication. *Id.* A physical examination revealed flexion of 140 degrees, abduction of 140 degrees, external rotation of 60 degrees, and mild strength deficits. *Id.* Dr. Geissler prescribed Petitioner 50mg of Tramadol and encouraged her to do home exercises. *Id.* at 14, 18.

On September 15, 2021, Petitioner returned to Dr. Geissler for a one-year post-operative visit. Pet'r's Ex. 9 at 32. Petitioner reported "some ache to her shoulder" and "a little bit of stiffness." *Id.* A physical examination revealed flexion at 140, abduction at 140, external rotation to 70, and strength at 4/5. *Id.* Dr. Geissler administered a 40mg injection of Depo-Medrol and advised Petitioner to return to physical therapy. *Id.*

Petitioner began an additional round of physical therapy at Elite Physical Therapy on September 20, 2021. Pet'r's Ex. 10 at 55. At her evaluation, Petitioner reported that she recently

"had more pain and difficulty lifting arm overhead and behind back." *Id.* Petitioner reported pain of 5/10 with a flexion and abduction of 130. *Id.* at 55–56. By November 4, 2021, Petitioner completed 15 physical therapy sessions.  *Id.* at 10. Petitioner's pain was 1/10 with active flexion of 165 and abduction of 160. *Id.* Petitioner had full strength. *Id.* at 10–11. Petitioner had met her long-term goals. *Id.* at 13.

On April 4, 2022, Petitioner returned to Dr. Geissler with complaints that her shoulder was "getting a little tight." Pet'r's Ex. 22 at 9. A physical examination revealed active flexion of 160, abduction of 140, and strength 4/5. *Id.* Dr. Geissler advised that Petitioner did not require further physical therapy because she had "good functional motion." *Id.* Petitioner was advised to continue at-home strengthening program. *Id.*

Petitioner returned to Dr. Geissler on March 6, 2024, for an evaluation after her shoulder "suddenly locked up" two weeks ago. Pet'r's Ex. 22 at 144. Petitioner reported that she had a stomach infection a few months ago and currently used a boot on her right foot. *Id.* at 144–45. A physical examination revealed active flexion of 140, abduction of 120, external rotation of 70, and strength at 4/5. *Id.* at 145. Dr. Geissler injected 4mg of Depo-Medrol into Petitioner's right shoulder and advised her to return in four months. *Id.* Dr. Geissler noted that Petitioner may require more than one injection and if "she [did] not improve, she may be a candidate for arthroscopic debridement of the calcium deposit." *Id.*

No additional medical records were filed.

III.    **Statements**[11]

A. **Petitioner's Initial Declaration**

In her initial December 30, 2020 declaration, Petitioner described "immediate pain at the injection site" upon administration of the vaccine. Pet'r's Ex. 3 at ¶ 5. She stated that her pain "worsened over the next several days" and she suffered from limited range of motion and "increased pain with certain movements." *Id.* Heat, ice, and over-the-counter pain medication was not sufficient to manage the pain. *Id.* Petitioner described her appointments with both Dr. Momah and Dr. Pierre and stated that their remedies of ice, Ibuprofen, and Flexeril were not working. *Id.* at ¶¶ 6–8. She saw Dr. Geissler for an MRI, which revealed "a rotator cuff tear around the same area where the flu shot was administered." *Id.* at ¶ 11. She underwent surgery for this on February 18, 2020, and "was instructed to wear a sling until [her] first post-op[erative] follow-up." *Id.* at ¶ 12.

After her sling was removed, she began physical therapy and completed 18 sessions between March and May of 2020, in addition to prescribed home exercises twice a day. Pet'r's Ex. 3 at ¶ 14. Despite this, Petitioner stated that her "shoulder was still very painful." *Id.* She then completed another 25 sessions of physical therapy at the instruction of Dr. Geissler, where she stated that she "had excruciating pain after each session," and that she had "never had anything hurt [her] so bad in [her] life. Every time the therapist would move [her] shoulder [she] would holler in pain." *Id.* at ¶¶ 15–16. Petitioner described it as "a terrible feeling of pain" and stated that

---

[11] Only the portions relevant to damages are discussed herein.

she "would often cry on [her] way back home from therapy." *Id.* at ¶ 16. She continued to ice her shoulder at night, and her pain gave her difficulty sleeping, as "[t]he only way [she] was able to sleep [was] when [she] was propped up in bed." *Id.* She also stated that her therapist described her condition as frozen shoulder. *Id.* She relayed this to Dr. Geissler, and "told him about the severe pain" she was having, and he ordered her a steroid injection and an additional six weeks of physical therapy. *Id.* at ¶ 17.

Petitioner completed another 11 sessions of physical therapy between July and September 2020, and she "did not notice any improvement" in her range of motion and she continued to have pain. Pet'r's Ex. 3 at ¶ 18. She also stated that she went on vacation "but was unable to enjoy any recreational activities, such as tennis or jet skiing, because of [her] right shoulder pain and dysfunction." *Id.* Petitioner also claimed to have turned down "a principal position at the Mississippi Department of Correctional Center in Pearl[,] Mississippi . . . because of [her] shoulder injury and [her] need for extensive physical therapy and another surgery." *Id.* at ¶ 20. At her September 14, 2020 follow-up with Dr. Geissler, Petitioner stated that "immediately" upon trying to move her arm, Dr. Geissler stated she had frozen shoulder and would require surgery, which Petitioner received on September 22, 2020. *Id.* at ¶¶ 21–22. She started post-operative physical therapy on September 28, 2020, and claimed that although she "ha[d] been doing better with therapy, [she] still ha[d] weakness [and] limited range of motion in [her] right shoulder." *Id.* at ¶ 23. She stated that Dr. Geissler advised her to "use [her] shoulder as much as possible." *Id.* at ¶ 24. He prescribed her six more weeks of physical therapy on December 2, 2020, and stated he would prescribe additional physical therapy if Petitioner did not have "satisfactory range of motion after those six weeks." *Id.* at ¶ 26.

Petitioner claimed that at the time of her declaration she continued to "have pain, limitations and dysfunction in [her] right shoulder." Pet'r's Ex. 3 at ¶ 27. She noted that while her symptoms had "improved," she still experienced weakness, tightness, pain, and limited range of motion, which she "manage[d] with oxycodone when it [got] bad." *Id.* She also asserted that she developed high blood pressure "which [she] believe[d] is related to [her] shoulder injury." *Id.* She has "difficulty with activities of daily living involving the use of [her] dominant right arm" and that that she was "still unable to enjoy recreational activities because of [her] right shoulder pain and dysfunction." *Id.* Petitioner feels that she "will never be able to do the things [she] was able to do prior to the vaccination." *Id.*

### B. Petitioner's Supplemental Declaration

Petitioner filed a supplemental declaration on May 17, 2022. Pet'r's Ex. 12. She stated that she "was hopeful that the pain would eventually subside on its own, but it just kept getting worse" after vaccination. *Id.* at ¶ 3. She claimed to have "returned to the pharmacy and spoke with the administering pharmacist several times over the next few weeks" to inform him that the pain had not gone away. *Id.* She explained that she "was guarding [her] shoulder" and holding her right arm to her body to avoid the pain, which made her "right arm . . . appear shorter than [her] left, and [she] began to have pain from [her] right shoulder into the right side of [her] neck." *Id.*

In total, Petitioner claimed to have attended 121 sessions of physical therapy in addition to her two surgeries following the injury to her right shoulder. Pet'r's Ex. 12 at ¶ 7. She explained

7

that her therapist had advised her to "do exercises at home and at the gym because by February 2021 [she] had already used up half of the number of sessions covered by Medicare." *Id.* at ¶ 9. She claimed this is why she did not attend physical therapy between February and September of 2021, and instead purchased a YMCA membership for water therapy and shoulder strengthening exercises. *Id.* She returned to physical therapy from September to November 2021, and was "given a lot of exercises to do at home and at the gym." *Id.* at ¶ 10. She claimed that she had incurred "significant YMCA membership dues" that she would not have otherwise incurred but for her shoulder injury. *Id.*

Petitioner stated that she continues to have "severe pain" in her right shoulder and that if she drives long distances her "shoulder gets stiff and painful." Pet'r's Ex. 12 at ¶ 11. She claims that she "will never be able to do simple things" she previously could do, such as washing her back by herself. *Id.* She also stated that she no longer has restful nights of sleep "because of [her] shoulder pain and having to toss and turn all night just to get some sleep." *Id.*

### C. Petitioner's Supplemental Affidavit

On January 8, 2025, Petitioner filed a supplemental affidavit. Pet'r's Ex. 23. She reported that since she received the flu shot, she has "experienced severe pain, limited range of motion, and significant dysfunction" that has "drastically impacted" her daily life. *Id.* at ¶ 2. Between November 2019 and April 2022, she completed 121 physical therapy sessions, underwent two surgeries, and received two steroid injections. *Id.* at ¶ 3. Following her first surgery in February 2020, she purchased a train ticket for her sister to travel from Chicago to assist with household chores. *Id.* at ¶ 4. She maintained a YMCA membership from 2020 to 2022 for shoulder exercises. *Id.* at ¶ 5. From 2022 to 2024 she experienced "constant pain" rated at a 5/10 and "limited mobility in [her] dominant right shoulder." *Id.* at ¶ 6. She stated it was impossible to wash her back or drive long distances due to the pain. *Id.* She also stated that in early 2024, her "shoulder unexpectedly locked up, intensifying [her] pain and weakness." *Id.* at ¶ 7. She returned to her orthopedist because of this and was given a third steroid injection. *Id.* She claimed that she continues to suffer pain and limitations from her shoulder injury and that she "must rely on [her] husband for everyday tasks [she] once managed independently." *Id.* at ¶ 8.

### D. Declaration of Anne Hanson

On May 17, 2022, Petitioner filed a declaration from her water fitness instructor, Anne Hanson. Pet'r's Ex. 13. She stated that Petitioner had been coming to her class "for years" and did not have any physical limitations prior to her shoulder injury. *Id.* at ¶ 2. In early November 2019 Ms. Hanson noticed Petitioner "holding her right arm stiffly by her side, which was unlike her." *Id.* at ¶ 3. Petitioner reportedly attributed the pain to her flu vaccine and stated that "she had been having worsening pain ever since." *Id.* The following day, Petitioner was unable to lift a 1.8lb weight with her right arm. *Id.* at ¶ 4. Following that day, Ms. Hanson reported that Petitioner began to miss her water fitness classes. *Id.* at ¶ 5.

### E.  Declaration of Mario Wiggins

On May 17, 2022, Petitioner filed a declaration from her online exercise coach, Mario Wiggins. Pet'r's Ex. 14. Mr. Wiggins claimed that he had been Petitioner's online exercise coach since 2017, and that in November 2019 she informed him of pain in her right shoulder following a flu shot. *Id.* at ¶¶ 2–3. He noticed significantly decreased range of motion, which he stated has persisted with "noticeable dysfunction and limitations" prevented her from doing "regular exercises ever since." *Id.* at ¶¶ 3–4.

### F.  Declaration of Judy Hetzel

On May 17, 2022, Petitioner filed a declaration from her friend, Judy Hetzel. Pet'r's Ex. 15. Ms. Hetzel stated that she sees Petitioner at least twice a month in addition to the water aerobics classes they take together. *Id.* at ¶ 1. Ms. Hetzel claimed that in November 2019 she saw Petitioner in her water aerobics class and that Petitioner told her she had worsening right shoulder pain following a flu vaccination. *Id.* at ¶ 2. She reported that Petitioner still appears to suffer from discomfort and limited range of motion in her right arm and that she is unable to use her right arm in water aerobics classes. *Id.* at ¶¶ 3–4.

### G.  Declaration of Jearldine White

On May 17, 2022, Petitioner filed a declaration from her friend Jearldine White. Pet'r's Ex. 16. She reported that she spoke on the phone with Petitioner nearly every day, including the day before and the day of her flu vaccination. *Id.* at ¶¶ 1–2. She reported that following her first surgery, physical therapy put her in so much pain that she would call her crying. *Id.* at ¶ 5. Ms. White reported that "although her pain seems more manageable now, she is still not the same after this injury." *Id.* at ¶ 6.

### H.  Declaration of Abraham Scott

On May 17, 2022, Petitioner filed a declaration from her husband, Abraham Scott. Pet'r's Ex. 17. He reported that the morning following her flu shot, Petitioner could "hardly move or raise her right arm" and that her pain continued to get worse over the next few days. *Id.* at ¶¶ 3–4. He further reported that Petitioner was unable to do household chores for a period of time such as washing dishes, making her bed, and mopping. *Id.* at ¶ 5. As of the filing of his declaration, Mr. Scott reported that Petitioner still "[could not] lift items of weight or reach overhead or across her body with her right arm." *Id.* at ¶ 6. "She [could] no longer drive long distances, and she still tosse[d] and turn[ed] at night because of the pain in her shoulder." *Id.*

## IV.  Arguments Regarding Damages

### A.  Petitioner's Argument

In Petitioner's motion for damages, she requested $2,323.33 to cover past unreimbursed expenses (out-of-pocket expenses). Pet'r's Br. at 1. This included expenses related to medical bills, the cost of her flu vaccination, physical therapy sessions, YMCA dues, and a round-trip

Amtrak ticket for her sister to travel to care for her following her surgery. *See id.* at 24. Petitioner also requested an award for past pain and suffering in the amount of $225,000.00.[12] *Id.* at 1. Petitioner focused on several factors for consideration, including her two shoulder surgeries, 121 physical therapy sessions, three steroid injections, pain years after vaccination, and the impact on her quality of life. *Id.* at 22; Pet'r's Reply at 3. She also cited to other Program cases to demonstrate similarities between her case and those cases that were awarded an amount similar to what she seeks here. Pet'r's Br. at 23; Pet'r's Reply at 3–4.

For example, Petitioner compared the facts of her case to *M.W. v. Sec'y of Health & Hum. Servs.*, and argued that the cases are similar, as both Petitioner and the petitioner in *M.W.* had two surgeries as a result of their SIRVA injury. No. 18-0267, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021). There, M.W. had undergone 71 physical therapy sessions, three MRIs, and two shoulder surgeries. *Id.* at *3. M.W. also reported constant pain, difficulty sleeping, and experienced an impaired ability to perform her job as a schoolteacher. *Id.* The special master awarded M.W. $195,000.00 for her past pain and suffering. *Id.* at *1.

*Schoonover v. Sec'y of Health & Hum. Servs.* was another surgical SIRVA case where the petitioner was awarded $200,000.00 in past pain and suffering. No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020). There, the petitioner experienced a severe SIRVA, with a 40% permanent partial disability to her left shoulder and was managing her pain with prescribed narcotics, with her pain ranging from a three to a nine on a scale of ten. *Id.* at *4. The Chief Special Master also noted that at the time, "this [was] the only SIRVA case in the Program where a petitioner underwent two shoulder surgeries on top of multiple steroid injections and numerous physical therapy sessions." *Id.* at *5.

In *Meindorf v. Sec'y of Health & Hum. Servs.*, another case cited by Petitioner, the petitioner was awarded $200,000.00 following three years of pain, including two surgeries, multiple rounds of physical therapy, three steroid injections, two MRI scans, and five laser treatments. No. 19-1876V, 2022 WL 1055475, at *2 (Fed. Cl. Spec. Mstr. Mar. 7, 2022). The special master here relied on the petitioner's continuous pursuit of medical treatment following her surgery and that the petitioner continued to suffer from decreased functional strength following her discharge from physical therapy, as well as the fact that the petitioner was a 36-year-old mother of two whose injury impacted her ability to engage with her family. *Id.* at * 2–3.

Petitioner also cited to *McDorman v. Sec'y of Health & Hum. Servs.*, a SIRVA case involving two surgical procedures, ten steroid injections, an MRI, and multiple rounds of physical therapy. No. 19-814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021). There, the special master awarded the petitioner $200,000.00 in past pain and suffering. *Id.* at *2. The special master noted that the petitioner had shown signs of improvement within two years of her vaccination, although this followed her surgeries and other treatment. *Id.* at *3. The petitioner rated her shoulder functionality as an 8/10 and her overall pain as a 2/10 two years following vaccination. *Id.* However, her doctor noted that she had reached "maximum medical improvement," and had subsequently developed right shoulder pain related to overuse stemming from the recovery of her left shoulder. *Id.* The petitioner's daily life was also affected, impairing her ability to care for her son with autism spectrum disorder and forcing her to sell her sailboat due to her inability to

---

[12] Petitioner did not request an award of future pain and suffering.

engage in sailing. *Id.* at \*4.

In her reply to Respondent, Petitioner cited to three more SIRVA cases to demonstrate comparability between damages awards. Petitioner argued that the first, *Joyce v. Sec'y of Health & Hum. Servs.*, was the "most comparable to this case, but [Petitioner's] injury is more severe, involving significant functional limitations in her dominant arm, longer duration of symptoms, and over three times as many physical limitations." Pet'r's Reply at 3 (citing No. 20-1882V, 2023 WL 6811015 (Fed. Cl. Spec. Mstr. Sept. 12, 2023)).

Next, Petitioner cited to *Elmakky v. Sec'y of Health & Hum. Servs.*, where the petitioner was awarded $205,000.00 for past pain and suffering. No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021). There, the petitioner underwent three surgeries and ultimately recovered from what the Chief Special Master described as a "severe" SIRVA. *Id.* at \*5–6. Petitioner argued that her award should exceed that of the petitioner in *Elmakky* because her "treatment has been more intensive, and her recovery remains incomplete." Pet'r's Reply at 3.

Finally, Petitioner cited to *Lawson v. Sec'y of Health & Hum. Servs.*, where the petitioner was awarded $205,000.00 for past pain and suffering. No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021). There, the petitioner underwent four years of treatment for her injury, including three surgeries, which did not fully resolve her pain. *Id.* at \*4. In that case the Chief Special Master analogized the petitioner in *Lawson* to the petitioner in *Schoonover*, finding that both underwent "lengthy and significant medical and surgical care and treatment and suffered episodes of severe pain and limited mobility." *Id.* at \*5 (citing *Schoonover*, 2020 WL 535134 at \*4). The special master in *Lawson* thus justified the award of $5,000.00 greater than that in *Schoonover* due to the petitioner's "unprecedented three surgeries, seven steroid injections, four rounds of [physical therapy], six MRIs, and most recently started PRP injections." *Id.* However, the petitioner's pain was also intermittent, with some instances of relief, and the special master noted that it was "ambiguous" as to whether the petitioner's third surgery was actually related to her SIRVA. *Id.* at \*6. Here, Petitioner argued that her "prolonged pain and functional restrictions, coupled with her dominant arm being affected, exceed the hardships in *Lawson*." Pet'r's Reply at 3–4.

## B. Respondent's Argument

Although Respondent was explicitly directed not to brief the issue of out-of-pocket expenses, Respondent contested the $2,323.33 in out-of-pocket expenses requested by Petitioner. Resp't's Br. at 11. As mentioned above, I directed Respondent not to brief this issue due to his own unwillingness to consider evidence timely presented by Petitioner, and I am not considering Respondent's arguments to this point. I will assess the nature and persuasiveness of the evidence presented by Petitioner in support of her requested amount and render a reasoned decision aligned with the facts and consistent with prior cases in the Program.

Regarding Petitioner's pain and suffering, Respondent argued that Petitioner's requested award of $225,000.00 is excessive, and instead proposed Petitioner receive $120,000.00. Resp't's Br. at 9. Respondent noted that Petitioner "experienced approximately two years of shoulder discomfort following vaccination" and that her last physical therapy appointment was on

November 4, 2021. *Id.* (citing Pet'r's Ex. 2 at 3–4; Pet'r's Ex. 10 at 10–13). Respondent noted that at this appointment, Petitioner reported "minimal pain, full strength, and met her long-term therapy goals." *Id.* Respondent also argued that Petitioner is retired, and thus the injury did not affect her occupation. *Id.* Respondent argued that Petitioner "made a full recovery" and that she no longer required physical therapy due to her "good functional motion." *Id.* (citing *Scott v. Sec'y of Health & Hum. Servs.*, No. 20-1982V, 2024 WL 4544335, at *6 (Fed. Cl. Spec. Mstr. Sept. 25, 2024).

Respondent also argued that Petitioner's case illustrations were not analogous to her case because she "failed to elaborate on their context or fact pattern and if those cases are even analogous to the case at issue." Resp't's Br. at 9–10. He noted that the petitioner in *M.W.* had four years of sequelae; that the petitioner in *Schoonover* was a mother, practicing respiratory therapist, and suffered a permanent disability; that *Meirndorf* involved three years of sequelae and laser treatments; and that *McDorman* found no surgical relief and received 10 total injections in her shoulder. *Id.* at 10 (citing *M.W.*, 2021 WL 3618177; *Schoonover*, 2020 WL 5351341; *Meirndorf*, 2022 WL 1055475; *McDorman*, 2021 WL 5504698). Respondent concluded that Petitioner's SIRVA was "moderately severe" and required only "conservative treatment" aside from her two surgeries. *Id.* Respondent also argued that Petitioner "fully recovered," and thus should be awarded "a lower pain and suffering award than other SRIVA cases in which a petitioner's injury involved treatment with two arthroscopic procedures." *Id.*

## V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act may include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, . . . not to exceed $250,000." § 15(a)(4). There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.,* 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed

that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap, criticizing this as constituting "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, he found that pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program, applying the statutory cap only thereafter. *Id.* at 595.

## VI.    Prior SIRVA Compensation

### A.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2026, 5,397 SPU SIRVA cases have resolved since the inception of the SPU ten years before. Compensation has been awarded in the vast majority of cases (5,194), with the remaining 203 cases dismissed. Although this case was ultimately removed from the SPU, consideration of the SPU compensated cases can provide some insight on an appropriate damages award.

Of the 5,194 compensated cases, 2,946 SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession). In only 351 of these cases was the amount of damages determined by a special master in a reasoned decision. The written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive. *See, e.g.*, *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

### B.  Pain and Suffering Awards in Reasoned Decisions

In the 351 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a petitioner's delay in seeking treatment—over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion. MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These mild to moderate SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy. None required surgery. Except in one case involving very mild pain

levels, the duration of the SIRVA injury ranged from six to thirty months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within thirty days of vaccination. All petitioners with significant pain also experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 physical therapy sessions—occasionally spanning several years—and multiple cortisone injections, were required in these cases.

## VII.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I will address the remaining factors to be considered when determining an award for pain and suffering: the severity and duration of Petitioner's injury.

A review of her medical records reveals preponderant evidence that from the date of vaccination on October 30, 2019, until her first surgery on February 18, 2020, Petitioner initially suffered from a moderate SIRVA. While Petitioner did not immediately seek medical attention after the alleged onset of her SIRVA, she did report pain associated with her flu vaccination at her PCP appointment three weeks later on November 20, 2019. She returned again, after another three weeks on December 10, 2019, with an onset of four-to-five weeks and no range of motion limitations. She began to describe her pain as "sharp" on December 19, 2019, about two months following vaccination, and her physical examination then revealed a reduced range of motion. *See* Pet'r's Ex. 4 at 129. Petitioner began physical therapy, and after three sessions her pain had reduced to a 2/10 on January 3, 2020. However, approximately three weeks later on January 22, 2020, Petitioner reported worsening pain, numbness, and extreme range of motion deficits, and was instructed to begin physical therapy. She reported that physical therapy did not provide relief and requested surgery, which was performed approximately one month later on February 18, 2020.

Following her surgery, Petitioner's condition progressed to a more severe case of SIRVA. She began physical therapy on March 23, 2020, but in July 2020 Petitioner experienced a sudden onset of frozen shoulder, resulting in the administration of her first steroid injection. Petitioner would continue to attend physical therapy until September 9, 2020, for a total of 55 sessions. However, at her September 14, 2020 follow-up with Dr. Geissler, he noted that there had been no improvement since her July 2020 steroid injection, and he recommended a second arthroscopic surgery. During her procedure, Dr. Geissler noted that Petitioner's shoulder was so stiff he "could not manipulate it." Pet'r's Ex. 4 at 667. Petitioner then began her third round of physical therapy on September 28, 2020.

Following her second surgery, Petitioner was advised to use her shoulder as much as possible and was noted to have significant improvement at a December 2, 2020 follow-up

appointment. Petitioner also reported she no longer required pain medication. Petitioner's final physical therapy appointment was on February 2, 2021, and she rated her pain as a 2/10, met three of her goals, and partially met the remaining three goals. Several months later, on September 15, 2021, Petitioner returned for her one-year post-operative visit and reported aching and stiffness in her shoulder. She received her second steroid injection and returned to physical therapy. Her rated pain was a 5/10 and she had slightly reduced range of motion in her shoulder. By November 4, 2021, her pain had reduced to a 1/10 following 15 physical therapy sessions and she had returned to full strength. Petitioner complained of tightness in April 2022, but her surgeon advised against further physical therapy because she continued to show good functional motion. No further reports were made until March 6, 2024, when Petitioner returned to Dr. Geissler with complaints of her shoulder locking up two weeks prior. She received her third steroid injection and was considered a possible candidate for another arthroscopic surgery if her symptoms did not improve.

To support the amount requested, Petitioner claims the most analogous case is *Joyce*. *See* 2023 WL 6811015. However, a review of this case reveals that the Chief Special Master issued an oral ruling in this case, which he incorporated in a two-page published decision. *See id.* at *1. The Chief Special Master did not explain his reasoning and did not set forth any of the facts of the case. *Id.* Although Petitioner's counsel, Mr. Zgheib, was also the counsel for the petitioner in *Joyce*, I cannot confirm the assertions he sets forth regarding the comparability of these two cases, nor can I assess the Chief Special Master's reasoning. All I can ascertain from the decision cited by Petitioner is that the petitioner in *Joyce* suffered a SIRVA and was awarded $215,000.00 for past pain and suffering. *See* 2023 WL 6811015, at *1.

Instead, a review of the cases cited by Petitioner reveals the most comparable case to be *M.W.*, as both cases involved approximately four years of sequelae, several physical therapy sessions, and two surgeries. *See* 2021 WL 3618177. Further, while the special master in *M.W.* considered the impact the petitioner's injury had on her position as a schoolteacher, and Petitioner here is retired and not working, I find it significant in this analysis to also consider that Petitioner appears to be receiving ongoing treatment and has been considered for a third surgery by Dr. Geissler if injections do not improve her condition. Petitioner here has also attended several more physical therapy sessions (121) than the petitioner in *M.W.* (71). *See* 2021 WL 3618177, at *3.

However, Petitioner's case also presents several differences from the other cases she cites as analogous. *Schoonover* at the time was considered the most severe SIRVA in the program, as articulated by the Chief Special Master, but the petitioner also was left with a significant disability. 2020 WL 5351341, at *6. Similarly, the petitioners in *Meindorf* and *McDorman* had substantially more treatments than in this case. 2022 WL 1055475, at *2; 2021 WL 5504698, at *3. Petitioner also argues that her case was more severe than those of the petitioners in *Elmakky* and *Lawson*, however, each of those cases involved three surgical procedures. *See* 2023 Wl 6811015, at *5; 2021 WL 688590, at *6. Of note, the special master in *Lawson* specifically articulated the case was much more severe than that of *Schoonover*, though only awarded an increase of $5,000.00. *Lawson*, 2021 WL 688590, at *6. For those reasons, an award of pain and suffering lower than that awarded in *Schoonover*, *Meindorf*, *McDorman*, *Elmakky*, and *Lawson* is appropriate.

15

## VIII.    Petitioner's Out-Of-Pocket Expenses

Under the Vaccine Act, a petitioner is entitled to compensation for past out-of-pocket expenses related to her vaccine-related injury which have been incurred for "diagnosis, medical or other remedial care, rehabilitation . . . residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary." § 300aa-15(a)(1)(B). Petitioner seeks $2,323.33 in past out-of-pocket expenses, which includes $68.38 for her flu vaccination, $609.80 in medical bills, $1,374.00 in YMCA membership dues, $143.98 for rehabilitation equipment ordered from Amazon, and $127.00 for a round-trip Amtrak ticket for her sister to care for her following surgery. Given that Petitioner's injury required extensive rehabilitation and specialized equipment, I find this request reasonable and award Petitioner the full amount requested.

## IX.    Conclusion

After a careful and comprehensive review of the facts of this case and in consideration of all the arguments presented by both parties along with the relevant case law, **I find that $195,000.00 in compensation for actual pain and suffering is reasonable in this case. I also find that Petitioner's request of $2,323.33 for out-of-pocket expenses is reasonable. Therefore, I award a lump sum payment of $197,323.33 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.[13]** This amount represents compensation for all damages that would be available under § 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

---

[13] A previous version of this decision originally ordered Petitioner's damages award of $195,000.00 to be issued in the form of a check payable to Petitioner. This has been corrected to order distribution of Petitioner's damages award to Petitioner's counsel's IOLTA account.

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.